UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

M&T BANK CORPORATION,

               Plaintiff,

     v.                                       **DECISION AND ORDER**
                                                08-CV-581S

LaSALLE BANK NATIONAL ASSOCIATION,
GREENWICH CAPITAL MARKETS, INC., CAIRN
MEZZ ABS CDO III LTD., and CAIRN MEZZ
ABS CDO III, INC.,

               Defendants.

## I.  INTRODUCTION

Plaintiff M&T Bank Corporation, ("M&T") commenced this action by filing a Complaint in the Supreme Court for the State of New York, Erie County, on July 3, 2008. M&T claims that Defendants LaSalle Bank National Association (LaSalle),[1] Greenwich Capital Markets (Greenwich), Cairn Mezz ABS CDO III, Ltd. (Cairn Ltd.), and Cairn Mezz ABS CDO III, Inc. (Cairn Inc.) violated state statutory and common law when they failed to make interest payments owed to Plaintiff on a fifty (50) million dollar note.  On August 6, 2008, Defendants removed the case to this Court on the ground of diversity of citizenship, 28 U.S.C. § 1332.  LaSalle has moved to dismiss the four claims asserted against it under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (Docket No. 9.)

---

[1] Plaintiff also named "LaSalle Global Trust Services, a Division of Bank of America Corporation" as a Defendant, but on November 20, 2008, M&T and LaSalle Bank National Association stipulated to its dismissal from the case.  (Docket No. 24.)  Thus, "LaSalle" refers solely to LaSalle Bank National Association.

Greenwich, Cairn Ltd., and Cairn Inc. jointly moved to dismiss the five claims brought against one or more of them.  (Docket No. 12.)   The motions are fully briefed and the Court has determined that no oral argument is necessary.  For the reasons discussed below, Defendants' Motions to Dismiss are granted in their entirety.

## II.  BACKGROUND

### A.    The Facts

The Complaint's allegations and referenced documents reveal the following relevant facts.  Cairn Ltd. and Cairn Inc. (the "Cairn Defendants") are co-issuers of $960 million in notes (the "Cairn notes").  (Docket No. 1, Compl. ¶ 5.)  The Cairn notes are comprised of a series of debt instruments more commonly known as "collateralized debt obligations" ("CDOs").  (Id. ¶ 11.)  A CDO is a financial product for which the interest and principal payments owing on the debt are secured or "collateralized" by bonds and/or other interest bearing obligations.  (Id. ¶ 15.)  The Cairn notes are collateralized, in substantial part, by "subprime mortgages."  (Id. ¶ 11.)[2]

At some point, Greenwich, a registered broker-dealer, purchased the Cairn notes for resale to investors.  (Id. ¶ 9.)  Thereafter, Greenwich provided M&T with a Preliminary Offering Memorandum (POM) which summarizes and describes the Cairn notes and the payment stream they represent.  (Id. ¶ 12; Docket No. 22, Ex. B.)[3]  In relevant part, the

---

[2]  According to M&T, a mortgage is "subprime" if the borrower has a poor credit history, income level, or employment status such that he/she would not qualify for a standard mortgage.  (Compl. ¶ 11.)

[3]  M&T alleges that Greenwich provided it with the POM in "February 2007" (Compl. ¶ 12), but, in opposition to the Cairn Defendants' motion, appends and identifies a POM dated March 1, 2007 as "the Offering Memorandum referred to in the complaint" (Docket No. 22, Lane Dec., ¶ 3, Ex. B).

POM discusses 13 classes of notes, with each class representing a different level of priority to the collateral.[4]

On March 5, 2007, M&T purchased a Cairn "Class A2A note" from Greenwich in the amount of fifty (50) million dollars, which was to pay interest at the annual rate of 5.8176%. (Compl. ¶ 13.) A Class A2A note holds the second-highest level of priority to the collateral. (Id.) Only the Class A1-VF note, also referred to as the "Controlling Class," has a higher priority. (Id.) M&T believes that Greenwich owns all of the Class A1-VF notes. (Id. ¶ 9.)

On March 29, 2007, the Cairn Defendants and LaSalle, as trustee, entered into an Indenture. (Id. ¶ 5; Docket No. 14 ¶ 3 Ex. B.) As trustee, LaSalle is responsible for administering the collateral underlying the notes and making principal and interest distributions to the note holders in accordance with the Indenture. (Compl. ¶ 8.)

By letter dated April 25, 2008, LaSalle notified M&T "of the occurrence of an Event of Default pursuant to section 5.1(i) of the Indenture." ( Compl. ¶ 18.) Thereafter, on or about May 6, 2008, LaSalle issued a report on the status of the Cairn notes and the underlying collateral. (Id. ¶ 20.) The report indicated that the collateral earned $8,091,609 in "Available Interest Proceeds," approximately $1,583,448 of which was distributed to pay fees associated with the collateral and to pay interest and the commitment fee on the Class A1-VF notes. (Id.) Instead of paying interest on any other class of Cairn notes, LaSalle placed the remaining approximately $6,508,160 into a "Reserve Account" for the benefit of Greenwich, the Class A1-VF noteholder. (Id. ¶¶ 20, 22.) LaSalle advised M&T that it

---

[4] The notes are categorized as follows: A1-VF, A2A, A2B, B1, B2, C1, C2, C3, D1, D2, D3, E, and unsecured Subordinated Notes. (Docket No. 22, Ex. B, pt. 1, cover page.) Class A1-VF notes hold the highest priority, with the others holding priority in descending order.

interpreted section 13.1(a) of the Indenture as requiring it to take such action upon an Event of Default.  (Id. ¶ 22.)

**B.     The Claims**

M&T contends that LaSalle's placement of Available Interest Proceeds into a Reserve Account is contrary to both the terms of the Indenture and the Cairn Defendants' representations in the POM such that: (1) LaSalle breached its obligations under the Indenture and the Note; (2) M&T is entitled to a declaratory judgment on LaSalle's breach of the Indenture and the Note; (3) LaSalle breached its fiduciary duty as trustee of the Cairn Trust; (4) LaSalle unlawfully converted available interest proceeds due M&T; (5) Greenwich aided and abetted LaSalle in its breach of fiduciary duty; (6) Greenwich and the Cairn Defendants are responsible for material misrepresentations and false statements in the POM; (7) Greenwich and the Cairn Defendants violated New York's General Business Law section 350 when they issued the materially misleading POM; (8) Greenwich and the Cairn Defendants violated New York's General Business Law section 349 by soliciting investors through use of the materially misleading POM; and (9) M&T is entitled to rescission of the contract of sale for the Note.  (Compl. ¶¶ 30-63.)

LaSalle has moved to dismiss the first through fourth claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure  (Docket No. 9), and  Greenwich and the Cairn Defendants have moved to dismiss the fifth through ninth claims (Docket No. 12).

## III.  DISCUSSION

**A.      Motion to Dismiss Standard**

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *See* Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006).  "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'"  Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86, 91 (2d Cir. 2010) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.

The Supreme Court recently clarified the appropriate pleading standard in Ashcroft v. Iqbal, setting forth a two-pronged approach for courts deciding a motion to dismiss.  556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). The decision instructs district courts to first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  129 S. Ct. at 1950. Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. Second, if a complaint contains "well-pleaded factual allegations[,] a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Id.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. at 1949 (quoting and citing Twombly, 550 U.S. at 556-57 (internal citations omitted)).

Although courts normally are required to determine the sufficiency of the claims on the complaint alone, "documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007) (citation omitted).  Such is the case here.

**B.     LaSalle's Motion to Dismiss the First through Fourth Claims**

This dispute concerns how distributions are to be made to noteholders following an event of default.  It is M&T's position that, under sections 11.1 and 13.1(a) of the Indenture, it was entitled to receive, on May 13, 2008, a payment of Available Interest Proceeds of approximately $466,666.  According to M&T, after LaSalle notified it of the occurrence of an "Event of Default" and published a "Notice of Acceleration of Maturity" on the LaSalle website, it improperly diverted the May 13, 2008 interest proceeds that should have been paid to M&T and other subordinate noteholders to a Reserve Account for the benefit of Greenwich (the Class A1-VF noteholder).  (Docket No. 1 §§ 18-22.)

Section 11.1(a) of the Indenture relates to the priority of payments and states, in pertinent part:

> Notwithstanding any other provision in this Indenture, *but subject to the other clauses of this Section 11 and Section 13.1*, on each Distribution Date, the Trustee shall disburse amounts transferred to the Payment Account from the Collection Accounts during the Due Period relating to such Distribution Date . . . as follows and for application by the Trustee in accordance with the following priorities.

(Docket No. 14, Ex. B. § 11.1(a), p. 241 (emphasis added).)  What follows is the priority

to be applied to Interest Proceeds—first, taxes and fees owed by the Cairn Defendants (§ 11.1(a)(i)(A)), then fees to the Trustee (§ 11.1(a)(i)(B)(a)), followed by various accrued and unpaid fees and administrative expenses (§ 11.1(a)(i)(B)(b)-(c)), and next, payments due under various referenced agreements (§ 11.1(a)(i)(B)(d)-(E)).  Thereafter is the distribution at issue here:

> (F) to the payment of the Interest Distribution Amount and Commitment Fee with respect to the Class A1-VF Notes (in each case including Defaulted Interest and accrued interest thereon);
>
> (G) to the payment of the Interest Distribution Amount with respect to, **first**, the Clas A2A Notes, . . . . (emphasis in original).

Section 13.1(a), titled "Subordination," first confirms that Class A2A Notes, *inter alia*, are "subordinate and junior to the Class A1-VF Notes to the extent and in the manner set forth in this Indenture, including as set forth in Section 11.1 and hereinafter provided."  It goes on to state that:

> If any Event of Default has not been cured or waived and acceleration occurs in accordance with Section 5, including as a result of an Event of Default specified in Section 5.1(f) or (g), the Class A1-VF Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Subordinate Interests, in either case, in accordance with the Priority of Payments.

## 1.    *Breach of Indenture and Note*

In moving to dismiss the first cause of action, LaSalle argues that § 13.1(a)'s language relative to the Event of Default and acceleration is clear and unambiguous and requires that the Class A1-VF Notes be paid in full in cash prior to any payments to M&T.  Thus, LaSalle urges, its purported failure to make an interest payment to M&T is entirely consistent with the Indenture and cannot constitute a breach.

7

In response, M&T characterizes LaSalle's reading of §§ 11.1(a) and 13.1(a) as "unacceptable and impossible," and argues that the provisions are at best "ambiguous" because § 13.1(a) can be reasonably interpreted as requiring that payments be made in accordance with the Priority of Payments set forth in § 11.1, even <u>after</u> an event of default. M&T also contends the Court must consider the POM's terms when interpreting the Indenture.[5]  In particular, it alleges that the Indenture's  § 13.1  is at odds with the POM's "detailed description of the workings of the Indenture" (Docket No. 1 ¶¶ 25-26, referencing POM pp. 30-31 (hereafter, "OM")[6]), and argues that both of these documents contemplate the Indenture will conform to the "terms of the deal" as stated in the OM.[7]  (Docket No. 21 at 9).  While M&T does not allege that LaSalle had any role in drafting the OM or the Indenture, it does claim that LaSalle's conduct in interpreting the Indenture contrary to the "description" set forth at page 31 of the OM "was unreasonable, negligent, reckless and in breach of its duties as trustee."

In light of M&T's arguments, the first order of business is to decide whether the Court can consider the OM, which qualifies as parol evidence.  "The parol evidence rule

---

[5]  M&T states that it necessarily relied on the POM's terms in deciding to purchase its Class A2A Note, because the Indenture post-dates its purchase.  Therefore, it concludes, its expectation that the Indenture would conform to the POM is crucial here.

[6]  As noted at footnote 3, *supra*, M&T alleged that it received an offering memorandum in February 2007, and then later attested that it actually was relying on a document dated March 1, 2007. However, the language M&T quotes in its Complaint and memorandum is not found at the cited pages of the March 1, 2007 document.  Rather, the page citations are from an Offering Memorandum dated March 28, 2007.  (Docket No. 13, Ex. C.)  As this is the document expressly quoted in the Complaint, it is the document that will be referenced hereafter and is identified as the "OM."

[7]  Here, M&T relies on the Indenture's § 8.1, which permit the Co-Issuers and LaSalle to enter into supplemental indentures under various circumstances and for specified reasons, one of which is "to conform the terms of this Indenture to the terms set forth in the [final] Offering Memorandum."  (Docket No. 10 Ex. B § 81(n).)

bars the consideration of extrinsic evidence of the meaning of a complete written agreement if the terms of the agreement, considered in isolation, are clear and unambiguous." Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc., 111 F. Supp. 2d 450, 454 (S.D.N.Y. 2000). To apply the parole evidence rule, this Court must: "(1) determine whether the written contract is an integrated agreement; if it is, (2) determine whether the language of the written contract is clear or is ambiguous; and, (3) if the language is clear, apply that clear language." Sunrise Med. HHG, Inc. v. Health Focus of N.Y., No. 01-CV-597, 2005 U.S. Dist. LEXIS 2045, at *36 (N.D.N.Y. Feb. 15, 2005) (citation and internal quotation marks omitted).

An integrated contract is one which "represents the entire understanding of the parties to the transaction." Investors Inx. Co. v. Dorinco Reinsurance, Co., 917 F.2d 100, 104 (2d Cir. 1990). "Under New York law a contract which appears complete on its face is an integrated agreement as a matter of law." Battery Steamship Corp. v. Refineria Panama, S.A., 513 F.2d 735, 738 n.3 (2d Cir. 1975) (citing Higgs v. De Maziroff, 263 N.Y. 473, 478 (1934)); see also W.W.W. Associates, Inc. v. Giancontieri, 77 N.Y.2d 157, 162 (1990). That is, if the written agreement appears to define the extent of the parties' obligations, it is presumed to contain the parties' entire agreement. Wayland Investment Fund, LLC, 111 F. Supp. 2d at 454 (citations omitted).

M&T does not contend that the Indenture's terms are incomplete, on their face, such that it should not be considered an integrated agreement. Rather, it urges that, because the Indenture makes reference to the final "Offering Memorandum," the OM is not extrinsic evidence, but is itself part of the agreement allegedly breached. It points to the following: (1) the Indenture's inclusion of a definition of "Offering Memorandum" (defined as the "final

9

Offering Memorandum . . . as amended or supplemented on or prior to the Closing Date");
(2) the ability of the Co-Issuers and LaSalle to enter into a supplemental indenture to
conform the Indenture to the terms in the final Offering Memorandum (§ 8.1(n)); and (3)
the fact that the "Listing and General Information" section of the OM contains an
exception(s) to the Indenture's broad confidentiality provision (§14.14).  For the reasons
stated below, this Court finds the cited Indenture provisions do not relate to LaSalle's
alleged breach (placing Available Interest Proceeds into a Reserve Account for the benefit
of Greenwich), nor do they rely on the OM to establish party rights and obligations.

M&T relies primarily on section 8.1(n) in support of its argument that the OM's terms
are controlling.  It urges that, generally, LaSalle may enter into a supplemental indenture
to conform to the terms of the final Offering Memorandum without notice to and approval
from other noteholders, and argues that it therefore should have modified or eliminated
section 13.1.   But section 8.1(n) clearly is permissive; while it allows LaSalle to enter into
a supplemental indenture for the stated purpose, it does not mandate action.[8]  Moreover,
as LaSalle notes in its reply, section 8.2(h) prohibits the Trustee from entering into a
supplemental indenture that modifies the terms of section 13.1 except with the consent of
all noteholders and, perhaps, others.

> [N]otwithstanding anything in this Indenture to the contrary, no such
> supplemental indenture shall be entered into, without the consent of each
> Holder of each Outstanding Secured Note of each Class and each Holder of
> each Outstanding Subordinated Note . . . [and others, to the extent required]
> if such supplemental indenture proposes to:
> * * * *
> (h)      modify the definition of the term "Outstanding", Section 11.1 or

---

[8]  "[T]he permissive right of [LaSalle] to take or refrain from taking any actions enumerated in this Indenture shall not be construed as a duty[.]" (Docket No. 10, Ex. B § 6.3(i).)

Section 13.1;

(Docket No. 10, Ex. B pp. 198-99, § 8.2 par. 1 and clause (h) (emphasis supplied).)  M&T does not allege that any such consent was given.

Because the Indenture appears as a complete agreement on its face, and does not rely on the OM to establish rights and obligations, it is an integrated agreement as a matter of law.  Accordingly, the OM cannot be considered unless the challenged provisions are ambiguous.

Whether a written contract is ambiguous is a question of law to be decided by the court.  W.W.W. Assocs., Inc., 77 N.Y.2d at 162 (citation omitted).  A contract is ambiguous if its terms could suggest "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d Cir. 1997).

It is a fundamental principle of contract law that courts must interpret and give meaning and effect to every provision in a contract.  Browning-Ferris Indus. v. County of Monroe, 103 A.D.2d 1040, 1040, 478 N.Y.S.2d 428, 430 (4th Dep't 1984).  Courts "should not adopt an interpretation which will operate to leave a provision of a contract . . . without force and effect."  Ruttenberg v. Davidge Data Systems Corp., 215 A.D.2d 191, 196, 626 N.Y.S.2d 174 (1st Dep't 1995) (citing Laba v. Carey, 29 N.Y.2d 302, 308, 327 N.Y.S.2d 613 (1971)).  "An interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation."  Ruttenberg, 215 A.D.2d at 196 (citing cases).

11

Here, the Court finds the Indenture unambiguously provides that the Priority of Payments set forth in section 11.1(a) is subject to section 13.1, which governs in the event of default and acceleration.  M&T contends that, even assuming that is so, an ambiguity exists because section 13.1 itself—in particular, the clause "*in either case*, *in accordance with the Priority of Payments*"—can be read to require that the section 11.1(a) priority be applied to interest payments even after an event of default.  This conclusory statement is not persuasive.

Section 13.1(a), which must be read as a whole and in the context of the entire Indenture, benefits two distinct groups of secured parties.  The first to benefit are the "Hedge Counterparties, the Funding Swap Counterparty and the Credit Default Swap Counterparty."  "If any Event of Default has not been cured or waived and acceleration occurs . . ., all amounts payable to [the counterparties] shall be paid in Cash before any further payment or distribution is made on account of the Subordinate Interests."  The next to benefit are the Holders of the Class A1-VF Notes.  Precisely the same substantive provisions are repeated, except for the addition of the language M&T declares is ambiguous.  "If any Event of Default has not been cured or waived and acceleration occurs . . ., the Class A1-VF Notes shall be paid in full in Cash before any further payment or distribution is made on account of the Subordinate Interests, *in either case, in accordance with the Priority of Payments*."  Here, the "in either case" clearly and unambiguously refers to either of the senior interests—*i.e.,* whether outstanding amounts are owed to counterparties and/or on the A1-VF Notes.  This language simply confirms that both must be paid in full before payments of any type are made to subordinate noteholders, such as

M&T, and that should funds be available for such payments, they will then be made in accordance with section 11.1.   M&T's interpretation, in addition to being devoid of supporting analysis, would render the § 13.1 default provisions superfluous.   As noted above, such a result is disfavored.

Because the Indenture is an integrated document and the challenged language is unambiguous, the parol evidence rule precludes consideration of the OM.   Moreover, given this Court's reading of sections 11.1 and 13.1, M&T fails to state a claim for breach of the Indenture.

The first cause of action further claims that LaSalle breached the Class A2A note. In moving to dismiss, LaSalle first argues that  M&T's claim is insufficient because it does not identify the provision(s) of the Note purportedly breached.   I agree.   A claim or counterclaim based on breach of contract must identify the specific contractual provision(s) allegedly breached.  Paul v. Bank of Am. Corp., No. 09-CV-1932, 2011 U.S. Dist. LEXIS 15569, at * 15 (E.D.N.Y. Feb. 14, 2011) (describing plaintiff's failure to identify provision allegedly breached as "fatal flaw," and dismissing breach of contract claim); *see also,* Orange County Choppers, Inc. v. Olaes Enters., 497 F. Supp. 2d 541, 554 (S.D.N.Y. 2007) (dismissing counterclaims of breach of contract on ground that alleging specific provision breached is an essential requirement for such claims); Wolff v. Rare Medium, Inc., 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002) ("When pleading . . . [a breach of contract claim], a plaintiff must identify the specific provision of the contract that was breached as a result of the acts at issue"), *aff'd*, 65 F. App'x 736 (2d Cir. 2003).

In opposition to LaSalle's motion, M&T argues that LaSalle's "breach of the Indenture has . . . prejudiced M&T's rights under the Class A2A note, which includes a

promise to pay interest to the noteholder in accordance with the Priority of Payments established in the Indenture."  (Docket No. 21 at 13.)  Even assuming this belated identification were sufficient to avoid dismissal, the claim otherwise fails.  The paragraph M&T appears to rely on states that:

> Payments of principal of and interest on this Class A2A Note are subordinated to the payment on each Distribution Date of certain other amounts in accordance with the Priority of Payments and *Section 13.1 of the Indenture*.

(Docket No. 22, Ex. A at 228.)  In short, a finding that this paragraph of the Note was breached depends upon a finding that the Indenture was breached.  As this Court already has determined that the failure to pay M&T interest in the circumstances alleged does not constitute a breach of the Indenture, the first cause of action must be dismissed in its entirety.

## 2.   *The Remaining Claims Against LaSalle*

M&T's remaining claims seeking declaratory judgment and of breach of fiduciary duty and conversion must be dismissed, as well.  Each claim is predicated on precisely the same conduct as the breach of contract claim—*i.e.*, LaSalle's "diversion" of Available Interest Proceeds into a Reserve Account was a breach of its duties and obligations under the Indenture and the Class A2A Note.  (Docket No. 1 ¶¶ 34, 36, 40.)  As this Court already has determined that the failure to pay M&T interest in the circumstances alleged does not constitute a breach of duty under either the Indenture or the A2A note, all claims pled in the alternative must also be dismissed.

* * * * *

For the reasons stated, LaSalle's motion is granted in its entirety, and the first

through fourth causes of action are dismissed.  On a Rule 12(b)(6) motion, claims typically are dismissed without prejudice.  Here, however, all relevant documents are before the Court and the issues presented involve questions of law such that dismissal with prejudice is warranted.

## C.     The Remaining Defendants' Motion to Dismiss the Fifth through Ninth Claims

### 1.     *The Aiding and Abetting Claim Against Greenwich*

In its fifth cause of action, M&T alleges that Greenwich aided and abetted LaSalle's breach of fiduciary duty by demanding that LaSalle apply an incorrect interpretation of the Indenture and wrongfully divert Available Interest Proceeds for Greenwich's benefit. (Compl. ¶¶ 42-45.)  "'A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach.'"  Lerner v. Fleet Bank, N.A, 459 F.3d 273, 294 (2d Cir. 2006) (quoting Kaufman v. Cohen, 307 A.D.2d 113, 125 (1st Dep't 2003)).

This Court already has determined that LaSalle's alleged conduct did not constitute a breach of its fiduciary duties as Trustee.  Accordingly, as a matter of law, M&T cannot establish the first element of its derivative aiding and abetting claim against Greenwich and its fifth cause of action is dismissed with prejudice.

### 2.     *The Sixth through Ninth Claims*

In its sixth claim, M&T alleges that, if the Court determines LaSalle's interpretation of the Indenture's section 13.1 is correct—as it has—then Greenwich and the Cairn Defendants are liable for making false and misleading statements to the contrary in the

OM.  In the seventh and eighth claims, M&T contends these same Defendants violated

New York's Consumer Protection Act because the OM constituted false advertising and

deceptive solicitation.  Based on the alleged negligent misrepresentation, M&T claims, in

the ninth cause of action, that it is entitled to rescission.

The language with which M&T takes issue is found at page 31 of the OM and states

that:

> Following an Event of Default and acceleration of the maturity of the Secured
> Notes, payments of interest on the Secured Notes shall continue to be made
> in accordance with the Priority of Payments.  As a result, interest on
> Subordinate Classes of Secured Notes (as well as other amounts set forth
> in the Priority of Payments) may continue to be paid prior to the payment in
> full of the principal amount of the Senior Classes of Notes.

### a.    *The Negligent Misrepresentation Claim*

Greenwich and the Cairn Defendants first argue that M&T's negligent

misrepresentation claim is preempted by the Martin Act and must, therefore, be dismissed.

The Martin Act, New York's blue sky law, prohibits various fraudulent and deceitful

practices relative to  securities.  N.Y. GEN. BUS. LAW Art. 23-A.  It authorizes the state's

attorney-general to investigate and commence actions or proceedings  relative to, *inter*

*alia*, "deception, misrepresentation, concealment, suppression, fraud, false pretense, or

false promise" relating to "the issuance, exchange, purchase, sale, promotion, negotiation,

advertisement, investment advice or distribution within or from [New York], of any stocks,

bonds, [or] notes."  Id. § 352(1).

At the time this motion was initially briefed there existed a split of authority, with a

number of decisions supporting Defendants' position that the Martin Act vests the attorney-

general with exclusive enforcement powers, and therefore does not provide a right of

action for private litigants such as M&T.  *See*, *e.g.*, <u>Castellano v. Young & Rubicam, Inc.</u>, 257 F.3d 171, 190 (2d Cir. 2001) (holding that to sustain a common law cause of action in the context of securities fraud would be inconsistent with the Attorney-General's exclusive enforcement powers under the Martin Act).  But, state law on this issue has evolved since that time.  Recently, the New York Court of Appeals held that "an injured investor <u>may</u> bring a common-law claim (for fraud or otherwise) that is not entirely dependent on the Martin Act for its viability."  <u>Assured Guar. (UK) Ltd. v. J.P. Morgan Inv. Mgmt. Inc.</u>, No. 227, 2011 N.Y. Lexis 3658, at *12 (N.Y. Dec. 20, 2011) (emphasis added). The Court of Appeals explained that "the plain text of the Martin Act, while granting the Attorney General investigatory and enforcement powers and prescribing various penalties, does not expressly mention or contemplate the elimination of common-law claims[.]"  <u>Id</u>. at *7.  It went on to consider the Martin Act's plain text, amendments, and legislative history, and concluded that none evidenced an intent to extinguish common law remedies. <u>Id</u>.  Finally, the Court of Appeals examined policy considerations and concluded that "the purpose of the Martin Act is not impaired by private common-law actions that have a legal basis independent of the statute because proceedings by the Attorney General and private actions further the same goal—combating fraud and deception in securities transactions." <u>Id</u>. at *12-13.

Defendants have offered no basis from which this Court can conclude, at this time, that M&T's negligent misrepresentation claim is predicated solely on a violation of the Martin Act or its implementing regulations such that it could not exist but for the statute. Accordingly, dismissal of this claim on the basis of preemption is denied, and Defendants' further arguments will be addressed.

17

The elements of a cause of action for negligent misrepresentation are: (1) awareness by the maker of a statement that the statement is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance.  Credit Alliance Corp. v. Arthur Andersen & Co., 65 N.Y.2d 536, 551 (1985); Ford v. Sivilli, 2 A.D.3d 773, 774 (2d Dep't 2003).  A plaintiff may recover for negligent misrepresentation "only where there is a special relationship of trust or confidence, which creates a duty for one party to impart correct information to another . . . The special relationship requires a closer degree of trust than that in an ordinary business relationship."  Wright v. Selle, 27 A.D.3d 1065, 1066-67 (4th Dept 2006); Auble v. Doyle, 38 A.D.3d 1264, 1266 (4th Dept 2007).

Here, M&T alleges that the OM, which it believes was drafted jointly by Greenwich and the Cairn Defendants, falsely states the manner in which interest proceeds are to be distributed upon an Event of Default.  (Docket No. 1 ¶¶ 47-49).  M&T further alleges that, due to their status as seller and co-issuers of the notes and their specialized knowledge relating to the notes, Greenwich and the Cairn defendants formed a "special relationship" with M&T.  (Docket No. 1 ¶¶ 48-49.)  Defendants move to dismiss on the ground that no "special relationship" exists, M&T does not and cannot allege actual reliance on the OM, and the OM does not contain a misrepresentation.  M&T opposes all aspects of the motion, and the arguments are addressed in turn.

While New York courts have recognized that a business relationship can give rise to a special relationship between parties, this occurs only where "the requisite high degree of dominance and reliance [ ] existed *prior* to the transaction giving rise to the alleged

18

wrong, and not as a result of it." <u>Societe Nationale D'Exploitation Industrielle Des Tabacs</u> <u>Et Allumettes v. Salomon Bros. Int'l</u>, 251 A.D.2d 137, 138 (1998) (emphasis supplied), *lv. denied*, 95 N.Y.2d 762 (2000).  Defendants argue that no such circumstance is alleged here.

In urging that a special relationship does exists, M&T first contends that, as a broker-dealer, Greenwich had a duty to provide it with accurate information and disclose all material information relative to the transaction at issue.  But the cases M&T relies on in support are inapposite because they relate specifically to duties that arise in a broker-client relationship.  M&T does not allege that Greenwich acted as its broker during or at any time prior to the transaction at issue and, indeed, such an allegation would be inconsistent with the facts pled.  "A broker is generally defined as an agent who, for a . . . brokerage fee, bargains or carries on negotiations in behalf of his principal as an intermediary between the latter and third persons . . . ."  <u>UWC, Inc. v. Eagle Indus., Inc.</u>, 213 A.D.2d 1009, 1010 (4th Dep't 1995).  Here, M&T alleges that Greenwich purchased the Cairn notes for resale, and then acted on behalf of itself and the Cairn Defendants in its communications with M&T.  (Docket No. 1 ¶¶ 9, 48.)  These allegations are entirely inconsistent with any suggestion that Greenwich and M&T had a broker-client relationship.

M&T goes on to contend that it may maintain a claim against Greenwich and the Cairn Defendants due to their expertise and "specialized knowledge of the collateral underlying the notes and the associated risk level created by this collateral." (Docket No. 20 at 12.) It primarily relies on <u>Kimmell v. Schaefer</u>, a seminal New York case on negligent misrepresentation in the context of commercial transactions, in support. 89 N.Y.2d 257, 264-65 (1996).  In <u>Kimmell</u>, the New York Court of Appeals held that an arms-length

commercial transaction, without more, cannot give rise to a duty of care.  Id. at 263.  Such

a transaction gives rise to a negligent misrepresentation claim only if a special relationship

exists between the parties by virtue of the defendant's "unique or specialized expertise,"

or the defendant's "special position of confidence and trust with the injured party."  Id.  For

example "[p]rofessionals, such as lawyers . . ., by virtue of their training and expertise, may

have special relationships of confidence and trust with their clients."  Id.  The Court of

Appeals went on to conclude that the record before it in that case supported a finding of

a special relationship because of the financial skill and expertise of the defendant (an

attorney and certified public accountant), the plaintiffs' awareness of the defendant's

participation in and knowledge of ventures similar to those he was then marketing, and the

defendant's continued attempts to seek out and communicate directly with the individual

plaintiffs to induce their investment through the use of false projections.  Id. at 264-65.

Since Kimmell, New York courts and federal courts applying New York law have

continued to follow the general rule of non-actionability for negligent misstatements made

in the context of arms-length business transactions.  See, e.g., M&T Bank v. Gemstone

CDO VII, Ltd., 68 A.D.3d 1747, 1750 (4th Dep't 2009) (dismissing claims against drafters

of offering materials on grounds that parties had no relationship prior to arm's length

transaction, and parties' allegedly "'unique or special expertise' alone is insufficient to

create an issue of fact concerning the existence of a special relationship"); SNS Bank, N.V.

v. Citibank, N.A., 7 A.D. 3d 352, 354 (1st Dep't 2004) (finding issuer of notes did not owe

fiduciary duty to plaintiff because their relationship as debtor and note-holding creditor was

purely contractual)[9]; <u>Alexandra Global Master Fund, Ltd. v. Ikon Office Solutions, Inc.</u>, No. 06-CV-7689, 2007 U.S. Dist. LEXIS 52546, at *14 (S.D.N.Y. 2007) (relationship between corporations and noteholders is contractual rather than fiduciary); <u>EED Holdings v. Palmer Johnson Acquisition Corp.</u>, 387 F. Supp. 2d 265, 282 (S.D.N.Y. 2004) (dismissing negligent misrepresentation claim where plaintiff did not allege defendant had any special professional training or past experience that would render his expertise "unique"); <u>Sheridan v. Trustees of Columbia Univ.</u>, 296 A.D.2d 314, 316 (1st Dep't 2002) (dismissing negligent misrepresentation claim upon finding that parties were clearly acting at arm's length and university did not owe duty to student-debtor).

Here, M&T alleges that Defendants had "specialized knowledge" of the underlying collateral's "effect on the structure of the Cairn CDO offering, the risk level and other matters relating to the notes, and the likelihood of an Event of Default under the Indenture." (Docket No. 1 ¶ 12.)  In short, Defendants are alleged to have understood the risks associated with investing in subprime mortgages.  Even assuming  Defendants' "knowledge" of such risks was greater than M&T Bank's, this generalized statement does not suggest that Defendants' purported mortgage expertise was "unique" in the financial industry such that it would engender the requisite high degree of dominance and reliance in a complex transaction among sophisticated parties.  Accordingly, the Court finds these

---

[9]  M&T attempts to distinguish this case on the ground that, in <u>SNS Bank</u>, "the complained-of misrepresentations were not even present in the Offering Memorandum."  (Docket No. 20 at 11.)  The alleged misrepresentation was "defendants' failure to disclose various items in the offering memorandum." <u>SNS Bank, N.V.</u>, 7 A.D.3d at 356.  This Court does not agree that the facts here are distinguishable.  M&T claims that, if Defendants' interpretation of the Indenture is correct, then the OM's inclusion of information regarding the Indenture's § 11.1 was false and misleading.  But the language regarding section 11.1 is not alleged to be false or misleading in and of itself; rather, the misrepresentation relates to the alleged failure to also disclose information relating to the Indenture's  § 13.1—*i.e.*, the misrepresentation was defendants' failure to disclose certain information in the OM.

allegations insufficient to suggest the existence of a special relationship.

Defendants next argue that M&T also has not alleged its actual reliance on the OM. A review of the Complaint reveals that, while M&T does allege Defendants believed and intended that purchasers would rely on the OM, it does not allege that it actually did so.

And even assuming M&T's Complaint were sufficient on its face, Defendants urge that any allegation of reliance is foreclosed as a matter of law due to the various limitations and disclaimers included in the OM. (Docket No. 20 at 17-19.) For example, M&T was on notice that the OM described only "certain provisions of the Secured Notes and that the Indenture," did "not purport to be complete," and was "subject to, and qualified in its entirety by reference to, the provisions of the Indenture." (Docket No. 13, Ex. C at 85, 113). Moreover, the OM advised that each purchaser of a Cairn note was:

> deemed to acknowledge, represent to and agree . . . [it] has such knowledge and experience in financial and business matters that [it] is capable of evaluating the merits and risks . . . of its prospective investment . . . is financially able to bear such risk, . . . is not relying on the advice or recommendations of [Defendants and specified others] . . . and has had acecss [sic] to such financial and other information concerning the . . . Notes as it has deemed necessary to make its own independent decision to purchase notes.

(Id. at 239-40).

Where a plaintiff is notified that the information it possesses is incomplete, or is subject to information contained elsewhere, the plaintiff "may truly be said to have willingly assumed the business risk that the facts may not be as represented." Belin v. Weissler, No. 97-CV-8787, 1998 U.S. Dist. LEXIS 10492, at *15-16 (S.D.N.Y. July 8, 1998) (quoting Rodas v. Manitaras, 159 A.D.2d 341, 343 (1st Dep't 1990)). In Belin v. Weissler, the district court concluded that the plaintiff's purported reliance on a particular representation

was not reasonable as a matter of law—whether or not he had ready access to the relevant information—because he was a sophisticated investor who had explicitly disclaimed reliance on the alleged misrepresentation.  Id. at *18-19.  See also, Lazard Freres & Co., 108 F.3d 1531, 1543 ( ) (where party proceeds with transaction after having been put on notice of existence of facts not yet documented, and does not either insist on examining the documentation or inserting language in agreement for its protection, its reliance on alleged misrepresentation is unreasonable as a matter of law).  It is well settled that a plaintiff cannot establish justifiable reliance when "by the exercise of ordinary intelligence" it could have learned of the information it asserts was withheld.  PPI Enters. (U.S. v. Del Monte Foods Co., No. 99-CV-3794, 2003 U.S. Dist. LEXIS 16006, at *68, 84-85 (S.D.N.Y. 2003) (citations omitted) (dismissing fraud claim where plaintiff was on notice that it possessed only selected information, but proceeded to enter contract which stated that it was fully able to evaluate merits of the transaction); Citibank, N.A. v. Plapinger, 66 N.Y.2d 90, 95 (1985) (finding that defendants' guarantee, though not an explicit disclaimer, foreclosed their claim of reliance on plaintiff's alleged oral promise); Gemstone CDO, 68 A.D.3d at 1750 (dismissing negligent misrepresentation claims where, inter alia, plaintiff was on notice of various limitations and disclaimers in offering circular).

Although M&T was expressly notified that the OM was subject to the terms of the Indenture, it does not allege that it requested a copy of the Indenture prior to proceeding with the transaction, nor that, absent the Indenture, it sought to add protective language to the party's agreement.  Accordingly, M&T's purported reliance on the OM was unreasonable as a matter of law.

Finally, Defendants argue that because the alleged misrepresentation is akin to an

opinion concerning the operation of the Indenture, and not a material fact, it cannot provide the basis for a misrepresentation claim at all.  Again, this Court agrees.  First, it already has been determined that the OM itself is not the governing document here.  Moreover, the claimed misrepresentation is found in a discrete portion of the OM titled "Risk Factors," and is prefaced by the express expectation "that prospective investors interested in participating in this offering are willing and able to conduct an independent investigation of the risks posed by an investment in the Notes."  (Docket No. 13, Ex. C at 28.)  Although M&T, throughout its opposing memorandum, refers to this section of the OM as a summary of the terms of the deal or description of the notes and/or indenture, the referenced text is clearly set apart from both the summary of terms (id. at 1-27) and the descriptions (id. at 85-133).  Thus, the very structure of the OM supports the conclusion that the separate discussion of risk factors is opinion.

The content of the alleged misrepresentation also supports this conclusion.  The provision on which M&T rests its claim states that, following an Event of Default, "payments of interest on the Secured Notes shall continue to be made in accordance with the Priority of Payments" and so "Subordinate Classes of Secured Notes . . . *may* continue to be paid prior to the payment in full of the principal amount of Senior Classes of Notes."  (Id. at 31(emphasis added).)  The very indefiniteness of this statement confirms that it is an expression of opinion, rather than fact, or, at best, an expression of expectations as to the general impact a possible future event might have on multiple classes of notes.  George Backer Mgmt. Corp. v. Acme Quilting Co., 46 N.Y.2d 211, 220 (1978) (landlord's interpretation of clause as limiting amount of tenant's future liability was expression of opinion which could not, as a matter of law, form basis for claim of misrepresentation);

24

United States v. Am. Soc'y of Composers, Authors and Publishers, No. 13-CV-95, 1989 U.S. Dist. LEXIS 16907, at *16-17(S.D.N.Y. Dec. 21, 1989) (statements reflecting party's view of the legal import of a particular document or set of facts are not properly treated as statements of fact and cannot support claim of misrepresentation); Charid Properties, Inc. v. Berger, 37 A.D.2d 987, 988 (2d Dep't 1971) (claim dismissed as a matter of law because representation as to amount that would be due under optional lease renewal was statement of opinion or law, not fact).

For all of the reasons discussed, this Court finds that M&T has not stated, and cannot state, a claim for negligent misrepresentation.  Accordingly, the sixth cause of action must be dismissed.

> b.   *The Statutory Claims*

M&T's statutory claims are brought under Sections 349 (deceptive business practices) and 350 (false advertising) of New York's General Business Law, the state's consumer protection laws, and allege that Defendants misled M&T by their omissions from and misrepresentations in the OM.  To establish a claim under these provisions, a plaintiff must demonstrate that: the challenged transaction was "consumer-oriented," (2) defendant(s) engaged in deceptive acts or practices, or in false advertising, and (3) plaintiff was injured by reason of defendant's deceptive or misleading conduct.  *See* Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 25 (1995) (setting forth elements of § 349 claim); Goshen v. Mutual Life Ins. Co., 98 N.Y.2d 314, 324 n.1 (2002) ("[t]he standard for recovery under [section] 350, while specific to false advertising, is otherwise identical to section 349").

Defendants urge that M&T's statutory claims must be dismissed as a matter of law

because sections 349 and 350 do not apply to securities, their alleged conduct was not "directed at consumers," and the statutes are directed to modest transactions, not to multi-million dollar deals among sophisticated parties.  They also contend that, even assuming M&T could state a valid claim for relief under either of these provisions, the claim(s) would be preempted by the Martin Act and, so, must be dismissed.  For the reasons stated below, this Court agrees with the first argument, and therefore need not consider the second.

Neither the New York Court of Appeals, nor the Second Circuit has construed section 349 or 350 in connection with securities transactions.  In the seminal district court case on the issue, Morris v. Gilbert, a customer sued a brokerage firm and a salesman in the firm, alleging fraud and other misconduct in connection with the sale of securities.  649 F. Supp. 1491, 1496-97 (E.D.N.Y. 1986).  The district court dismissed the section 349 causes of action on the ground that consumer fraud statutes are not intended to reach securities-related claims.  While acknowledging the broad scope of the statute, the court reasoned that "people do not generally buy securities in the same way that they buy an automobile, a television set, or the myriad consumer goods found in supermarkets. For one thing, securities are purchased as investments, not as goods to be 'consumed' or 'used.' Additionally, the securities markets are subject to pervasive federal regulation, and it is questionable that New York's legislature intended to give securities investors an added measure of protection beyond that provided by the securities acts[.]"  Id. at 1497.

Since then, district courts in this Circuit uniformly have applied Morris and its progeny to reject consumer protection law claims based on securities transactions.  *See* Estate of Pew v. Cardarelli, No. 05-CV-1317, 2009 U.S. Dist. LEXIS 90090, at *13-15

(N.D.N.Y Sept. 29, 2009) (collecting cases).  Moreover, the weight of authority in New York State's intermediate appellate courts holds likewise.  For example, the First and Third Departments consistently have applied <u>Morris</u> in rejecting claims based on securities transactions.  *See, e.g.*, <u>Dweck v. Oppenheimer & Co.</u>, 30 A.D.3d 163 (1st Dep't 2006); <u>Gray v. Seaboard Securities, Inc.</u>, 14 A.D.3d 852 (3d Dep't 2005); <u>Fesseha v. TD Waterhouse Investor Servs., Inc.</u>, 305 A.D.2d 268 (1st Dep't 2003); <u>In re Dean Witter Managed Futures Ltd. P'ship</u>, 282 A.D.2d 271 (1st Dep't 2001); <u>Schwarz v. Bear Stearns Cos.</u>, 266 A.D.2d 133, 698 N.Y.S.2d 855 (1st Dep't 1999).

M&T urges that Fourth Department cases are controlling here, and cites to two decisions in support of its argument that securities transactions <u>do</u> fall within the ambit of sections 349 and 350.[10]  I am not persuaded by the cited authority for two reasons.  First, both decisions lack supporting analysis.  Second, between its 1994 <u>Breakwaters</u> decision and its 2001 <u>Scalp & Blade</u> decision, the Fourth Department held, in <u>Smith v. Triad Mfg. Group, Inc.</u>, that section 349 <u>does not</u> apply to securities transactions because securities are purchased as investments, not as goods to be consumed or used.  255 A.D.2d 962, 963 (1998).  Plaintiffs have made no attempt to reconcile this inconsistent authority.  This Court will therefore follow the overwhelming weight of authority among the state's intermediate appellate courts and its fellow district courts in concluding that securities transactions fall outside the scope of sections 349 and 350.  Additional factors also support this conclusion.

---

[10]  <u>Scalp & Blade, Inc. v. Advest, Inc.</u>, 281 A.D.2d 882, 883 (4th Dep't 2001) (declining to invoke blanket exception under section 349 for securities transactions); <u>Breakwaters Townhomes Ass'n v. Breakwaters of Buffalo</u>, 207 A.D.2d 963, 963 (4th Dep't 1994) (rejecting argument that securities transactions do not come within ambit of sections 349 and 350).

As New York's Court of Appeals has observed, parties claiming the benefit of section 349 need not allege conduct that is repetitive or recurring, but they must allege acts or practices that "have a broad impact on consumers at large." New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 320 (1995).  Indeed, "'[t]he typical violation contemplated by the statute involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising.'" Teller v. Bill Hayes, Ltd, 213 A.D.2d 141, 146 (2d Dep't 1995) (quoting Genesco Entertainment, Div. of Lymitt Industries, Inc. v. Koch, 593 F Supp 743, 751(S.D.N.Y. 1984)).

M&T urges that its status as a business entity does not bar it from asserting a statutory claim, and this Court agrees.  However, I am not persuaded by M&T's further argument that Defendants' alleged wrongful conduct is consumer-oriented because "it will impact indirect investors and consumers harmed by the 'ripple effect' of another CDO implosion in a credit market already staggering under the strain of many such defaults." (Docket No. 21 at 20.)  In rejecting a similar argument by M&T, a state supreme court justice recently noted:

> To allow this litigation to become some sort of cause celeb regarding the meltdown of the credit markets and the current severe recession would be to abdicate the Court's sole responsibility to adjudicate the dispute between these parties. All of the parties to this litigation are sophisticated participants in the commercial arena. All of the parties elected to voluntarily enter into a private transaction. This litigation simply does not give rise to anything other than a private dispute lacking allegations of any wrongs directed against the consuming public.

M & T Bank Corp. v Gemstone CDO VII, Ltd., 881 N.Y.S.2d 364, ___, 2009 N.Y. Misc. LEXIS 710, at *51 (2009), modified on other grounds, 68 A.D.3d 1747 (4th Dep't 2009) (rejecting argument that transaction was "part of a 'vicious cycle' which traps 'consumers

between falling home prices and the tightening credit market,'" and dismissing section 349 and 350 claims on ground the alleged deceptive conduct was not consumer-oriented).

Finally, as numerous state and district courts have found, the amount of money involved in this transaction, along with the sophistication of the parties, are important factors in the analysis.  Section 349(h) awards prevailing parties the greater of actual damages or $50 and discretionary treble damages capped at $1,000.  The more generous section 350-e(3) provides for the greater of actual damages or $500 and discretionary treble damages up to $10,000.  The modest recovery available under these statutes weighs against their application to cases involving hundreds of thousands and perhaps millions of dollars and arising from complex transactions among sophisticated parties. *See, e.g.*, Waverly Properties, LLC v. KMG Waverly, LLC, No. 09-CV-3940, 2011 U.S. Dist. LEXIS 106410, at *46-47 (S.D.N.Y. Aug. 15, 2011); Teller, 213 A.D.2d at 774.

For these reasons, M&T is unable, as a matter of law, to state a claim under General Business Law §§ 349 and 350.

### c.    *The Claim for Rescission of Contract*

In its ninth, and final, cause of action, M&T claims it is entitled to judgment rescinding the contract on the basis of the material misrepresentations and omissions alleged in the Complaint.  (Docket No. 1 ¶ 63.)  Defendants argue that M&T's rescission claim must fail because it is derivative of the legally inadequate misrepresentation claim, and also because there can be no claim for rescission where a plaintiff has an adequate remedy at law.  M&T contests the first ground only.

A contract induced by fraud or misrepresentation is voidable and  subject to rescission.  *See, e.g.*, Hoke v. Shanker, 108 A.D.2d 1065 (3d Dep't), *lv. deni*ed, 65 N.Y.2d

605 (1985); <u>Mix v. Neff</u>, 99 A.D.2d 180, 182-83 (3d Dep't 1984).  To sustain such a claim, a plaintiff must show that the defendant made a false statement of material fact upon which the plaintiff reasonably relied to his detriment in entering into the agreement.  *See, e.g.*, <u>McDarren v. Marvel Entertainment Group</u>, No. 94-CV-0910, 1994 U.S. Dist. LEXIS 10144, at *23-24 (S.D.N.Y. July 20, 1994); <u>Rush v. Oppenheimer & Co.</u>, 650 F. Supp. 682, 683-84 (S.D.N.Y. 1986); <u>Comtomark, Inc. v. Satellite Communications Network</u>, 116 A.D.2d 499, 500-01 (1st Dep't 1986); <u>Clearview Concrete Products Corp. v. S. Charles Gherardi Inc.</u>, 88 A.D.2d 461, 467 (2d Dep't 1982).

As has already been determined here, M&T cannot, as a matter of law, demonstrate the existence of a false statement of material fact or its reasonable reliance.  As such, its derivative claim for rescission fails, whether or not this equitable remedy would otherwise be available to it.

## IV. CONCLUSION

For the reasons stated above, Defendants' Motions to Dismiss Plaintiff's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure are granted.  Because each of the claims fails as a matter of law, the dismissal is with prejudice.

## V.  ORDERS

IT IS HEREBY ORDERED, that LaSalle Bank National Association's Motion to Dismiss (Docket No. 9) is GRANTED.

FURTHER, that the Motion to Dismiss filed by Greenwich Capital Markets, Inc., Cairn Mezz ABS CDO III, Inc., and Cairn Mezz ABS CDO III, Ltd. (Docket No. 12) is

GRANTED.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.

Dated:   February 5, 2012
          Buffalo, New York

<u>/s/William M. Skretny</u>
WILLIAM M. SKRETNY
Chief Judge
United States District Court